United States District Court
Southern District of Texas
**ENTERED**
August 26, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MARY LOUZI,                               §
                                          §
            Plaintiff,                    §
VS.                                       §        CIVIL ACTION NO. 4:18-CV-04821
                                          §
FORT BEND COUNTY, TEXAS, *et al*,         §
                                          §
            Defendants.                   §

## <u>MEMORANDUM & ORDER</u>

Plaintiff Mary Louzi's son, Emmanuel Akueir, committed suicide while incarcerated at the Fort Bend County Jail at the age of 17.  As the representative of Akueir's estate, Louzi brings a Second Amended Complaint (Doc. No. 32) charging various institutional and individual actors affiliated with the Jail with violations of the federal Constitution and state law.  Before the Court are the Motion to Dismiss of Defendants Fort Bend County, Sheriff Troy Nehls, Deputy Kenneth Lewis, and Lieutenant Grant Crochet (Doc. No. 33), and the Motion to Dismiss of Defendants Dallas Ferguson, Regina Lisiecki, Matthew Zipprian, Aqeel Hashmi, and Correct Care Solutions, LLC (Doc. No. 34).

### I.      Louzi's Allegations

Louzi's Second Amended Complaint sets forth claims against the following Defendants: jail staff members Deputy Lewis and Lieutenant Crochet ("the individual jailers"); Fort Bend County; Fort Bend County Sheriff Nehls; medical contractor Correct Care Solutions ("CCS"); and CCS employees Zipprian, Lisiecki, Ferguson, and Hashmi (the "individual medical defendants"). The basic thrust of the Complaint is, first, that the County and Nehls maintained policies and allowed training failures that caused several inmate suicides, and, second, that the individual

jailers, individual medical defendants, and CCS committed lapses in care that caused Akueir's death in particular.

Louzi begins by alleging that the jail has "an atrocious record of failing to prevent suicide." (Doc. No. 32 ¶ 1.)  In general terms, she alleges that "many suicides and suicide attempts" have occurred at the Jail.  (Doc. No. 32 ¶ 1.)  And specifically, she describes two such suicides, each occurring less than sixteen months before Akueir's death in January 2017:  In September 2015, Heriberto Correas committed suicide by hanging while incarcerated at the jail, (Doc. No. 32 ¶ 1); soon after, in November 2015, Eugene Ethridge committed suicide by hanging while incarcerated at the jail, (Doc. No. 32 ¶ 23).

Louzi alleges that both Correas's and Ethridge's suicides prompted responses from the Texas Commission on Jail Standards.  (Doc. No. 32 ¶¶ 22, 24.)  In particular, the Commission expressed concern over jail staff's failure to perform regular rounds of the jail and to conduct face-to-face observation of incarcerated people.  (Doc. No. 32 ¶ 22.)  The Commission classified the jail as at-risk and required it "to submit a plan to prevent reoccurrence."  (*Id.*)

Nonetheless, Louzi alleges, the County and Sheriff Nehls "failed to implement appropriate supervision, measures, policies, training[,] and/or discipline" in response to these concerns.  (Doc. No. 32 ¶ 27.)  Rather, according to Louzi, the jail maintained a lax attitude toward inmate suicide. In particular, she alleges that the jail customarily "move[d] at-risk inmates . . . to solitary confinement, with no coordination of mental health care with CCS and its agents and employees." (Doc. No. 32 ¶ 26.)  Likewise, she alleges that CCS customarily "fail[ed] to communicate the need for follow up mental health care of inmates to the jailers."  (*Id.*)

In that context, the Complaint describes the events surrounding the death of Louzi's son, Emmanuel Akueir.  Akueir was taken into Fort Bend County Jail custody for robbery on January

2

4, 2017, "following a confrontation with a neighbor w[h]o had repeatedly bullied him." (Doc. No. 32 ¶ 20.) On January 5, he was placed on suicide watch "for depression." (Doc. No. 32 at 10.) And on January 6, Akueir had a troubling psychiatric consultation with Defendant Ferguson: He was "very tearful," reported a history of unmedicated bipolar disorder, stated that he had been bullied his entire life and sexually assaulted at a young age, suggested he had previously attempted suicide and—while "den[ying] having current suicidal thoughts"—admitted that he continued to "think[] about [suicide] often." (*Id.*)

Yet Akueir was almost immediately deemed healthy by CCS staff. On January 7, the day after Akueir's evaluation with Ferguson, Akueir was evaluated by Defendant Lisiecki and "denied any feeling of depression" to her. (Doc. No. 32 at 10.) Based on that evaluation, he was removed from suicide watch. (*Id.*) Then, on January 10, Defendant Zipprian reviewed Akueir's medical chart and gave him the highest-functioning mental health grade available. (*Id.*) Finally, on January 11, Akueir was seen by Defendant Hashmi and "reported a past psychiatric history of self-injurious behaviors" but denied "active thoughts of wanting to harm [him]self or others." (*Id.*) Based on this information, Hashmi diagnosed Akueir with Adjustment Disorder but determined that he did not "need psychiatric treatment at this time." (Doc. No. 32 at 11.)

This determination would prove fateful: Soon after his entry into the general population, Akueir was given a disciplinary violation, and on January 23—just over two weeks after his removal from suicide watch—he was sentenced to thirty days of solitary confinement for his offense of "throwing and spitting water at other inmates." (Doc. No. 32 at 11.) According to Louzi, this "abrupt and drastic change in his circumstances caused . . . Akueir to become despondent, and he made and wrote suicidal statements." (Doc. No. 32 ¶ 4.)

Tragically, on only his second day of solitary confinement, Akueir committed suicide by

hanging himself with his bedsheets.  (Doc. No. 32 ¶ 5.)  Defendant Lewis cut Akueir down with his personal pocketknife.  (*Id.*)  According to Louzi, Lewis should have instead used his jail-issued rescue knife to cut Akueir down, but the knife provided to him by Defendant Crochet was too dull to function effectively.  (*Id.*)  Louzi implies that the difference in knives might have affected Akueir's chances of survival, given that Akueir's pulse was briefly restored before he died in the hospital.  (*See id.*)

## II.      Rule 12(b)(6) Standard

A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint for failing to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  In ruling on a Rule 12(b)(6) motion, the court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff.  *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002).  A plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.     The Motions to Dismiss

The Court construes Louzi's Second Amended Complaint as pleading claims of deliberate indifference to Akueir's medical and mental health needs against the individual medical defendants, CCS, and the County; claims of unspecified constitutional violations against the individual jailers; and various state-law claims against the County, CCS, and the individual medical defendants.[1]  The Court concludes that the Motions to Dismiss must be granted as to the

---

[1] Louzi also pleads a failure-to-train claim against the County and Sheriff Nehls.  As per the Court's August 19, 2020, order, (Doc. No. 64), Defendants' motion to dismiss that claim is construed as a motion for summary judgment, and the Court reserves decision on that motion until

individual jailers and Louzi's state-law claims against the County, but otherwise denied as to the County, CCS, and the individual medical defendants.

### A.  Individual Jailers

The Court reads Louzi's Complaint to plead a single claim against each of the two individual jailers:  Louzi claims that Lewis is liable for his "inadequate effort and improper use of a rescue knife," and that Crochet is liable for his failure to train Lewis on the proper use of a rescue knife.  (Doc. No. 32 ¶ 34.)  These claims must be dismissed.

Louzi cannot state a section 1983 claim against Lewis.  As a government official sued in his official capacity, Lewis invokes the defense of qualified immunity.  (Doc. No. 33 at 8.)  To overcome Lewis's qualified-immunity defense at this stage, Louzi "must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).  Louzi has done neither.  The Complaint lacks any facts suggesting that Lewis was responsible for Akueir's death:  Lewis's sole contact with Akueir came upon discovering his body, at which point Lewis attempted to use his rescue knife and, when that knife failed, used his personal pocketknife "to extricate [Akueir] from a hanging position, cutting himself in the process."  (Doc. No. 32 ¶ 34.)  Louzi does not allege that Lewis was aware that his jail-issued rescue knife was defective,[2] and in the absence of such an allegation Louzi does not explain how Lewis's attempts to cut down Akueir with the equipment he had on hand could

---

it is fully briefed.

[2] In a supplemental filing, Louzi alleges that Lewis gave a "sworn statement where he admits knowledge of the 'cutdown knife' . . . being too dull to use." (Doc. No. 62 at 5.) Even if it were appropriate for the Court to consider this supplemental filing and/or Louzi's exhibits, the evidence belies Louzi's description of it: Lewis merely notes that he had "planned to sharpen [the knife] before carrying it on duty." (Doc. No. 62, Ex. 6, at 2.)

constitute deliberate indifference toward Akueir's medical needs.  Nor can Louzi "point to controlling authority . . . that defines the contours of the [violated] right with a high degree of particularity." *Waganfeald v. Gusman*, 674 F.3d 475, 483 (5th Cir. 2012).  Louzi has not cited, and the Court is unaware of, any controlling case that establishes the right to a non-defective rescue knife.  Lewis must therefore be dismissed as a defendant.

Likewise, Louzi cannot state a failure-to-train claim against Crochet.[3]  Failure-to-train claims are cognizable only where the plaintiff demonstrates that the defendant was deliberately indifferent to the violation of his constitutional rights; to do so, the plaintiff must point to either a history of similar violations or the "obvious[ness]" of the need for additional training.  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  Yet the Complaint is devoid of allegations that the jail has failed to properly deploy rescue knives in the past, nor does it contend that additional training on the use of rescue knives was obviously necessary.  Moreover, Crochet, like Lewis, invokes the defense of qualified immunity.  (Doc. No. 33 at 8.)  And as explained above, Louzi cannot overcome this defense because there is no controlling law establishing a right to a non-defective rescue knife.  Thus, Crochet must also be dismissed as a defendant.

## B.  The County

Louzi next asserts several claims against Fort Bend County under section 1983 for maintaining policies—in the form of unwritten customs—that caused Akueir's suicide.  To adequately plead § 1983 liability against the county, Louzi must show: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. N.Y.C.*

---

[3] Although this claim technically falls within the ambit of the Court's August 19 order, *see supra* n.1, the Court finds that it can be easily resolved without additional discovery.

6

*Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  A custom is "a persistent, widespread practice of [municipal] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to . . . fairly represent[] municipal policy." *Id.* at 579 (citation omitted).

The Court has identified five alleged customs in the Complaint that, according to Louzi, resulted in constitutional violations.  First, Louzi alleges that the County had a custom of "not communicat[ing] to mental healthcare staff" regarding suicidal inmates.  (Doc. No. 32, ¶ 33). Second, she alleges that the County had a custom of "put[ting] inmates into solitary confinement without considering the mental health and suicidal tendencies" of the inmate.  (Doc. No. 32, ¶ 33.) Third, she alleges that the County had a custom of "not doing rounds."  (*Id.*)  Fourth, she alleges that the County had a custom of "subjecting Mr. Akueir to inadequate care and supervision."  (*Id.*) Fifth, she alleges that the County had a custom of "not ensuring . . . continuing care" for inmates after a "sudden move to solitary confinement."  (Doc. No. 32, ¶ 35.)  The first alleged custom supports a cognizable claim of municipal liability; the others will be dismissed.

### 1.  Non-Communication Custom

Louzi's most compelling contention is that the County had a custom of failing to facilitate communication between jail staff and CCS staff regarding suicidal inmates.  (*See* Doc. No. 32, ¶ 33.)  Louzi has no trouble overcoming the first prong of the municipal liability inquiry here:  She has adequately pled that Sheriff Nehls was a policymaker for the jail, (Doc. No. 32, ¶ 27), and the County does not appear to argue otherwise.  The County does, however, argue that Louzi cannot satisfy the second and third prongs of the municipal liability inquiry as to this custom.  (Doc. No. 33 at 11; Doc. No. 40 at 2–3.)  The Court will consider each prong in turn.

### a.  Existence of a Custom

The Court begins with the second prong of the municipal liability inquiry, i.e., whether Louzi has adequately pled the existence of a custom.  Defendants argue that Louzi has failed to plead a custom because Louzi "does not allege a similar instance of where the County placed an inmate on mental health observation into disciplinary segregation without notifying the mental health staff."  (Doc. No. 40 at 3.)  But the Complaint can be read to allege a slightly more general custom:  The County's failure to facilitate communication between its jail and medical staff as to suicidal inmates.  (*See* Doc. No. 32, ¶ 33.)  And, consistent with that custom, Louzi points to the jail's alleged inability or refusal to remediate its failures surrounding past suicides—including the suicides of Correas and Ethridge, which occurred barely more than a year before Akueir's suicide.  (Doc. No. 32, ¶¶ 22–23.)  Though Louzi does not expressly allege that communication breakdowns caused either of these suicides, she does allege that, between the two suicides, the jail "failed to implement a new suicide screening form as directed by the [Texas Commission on Jail Standards]."  (Doc. No. 32, ¶ 25.)   From these facts, the Court can reasonably infer—as it must, at this stage—that the jail failed to involve mental healthcare staff in the intake process before both the Correas and Ethridge suicides.  This conclusion is bolstered by Louzi's allegation that Ethridge was "worried and depressed" upon his booking into the jail, yet apparently received no mental health intervention or monitoring sufficient to prevent his suicide.  (Doc. No. 32, ¶ 23.)  The upshot, then, is that the jail allowed three suicides to take place in a period of sixteen months, each of which could ostensibly have been avoided through better communication between jail and medical staff.

The question remains whether these three incidents suffice adequately to plead a custom of non-communication between jail and medical staff about suicidal inmates.  The Fifth Circuit

has emphasized that a custom can be inferred only from a pattern displaying "similarity and specificity," and involving "sufficiently numerous prior incidents, as opposed to isolated instances." *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (internal quotation marks and citation omitted).  The Fifth Circuit has further instructed that the analysis of whether such a pattern has been adequately pled is highly dependent on "context." *Id.* at 851–52 & n.4.  In *Peterson*, for example, the court found that twenty-seven incidents of excessive force over four years in a large police department did not amount to a custom, "[g]iven the department's size" and the fact that "the department conducted an internal investigation" into each incident, which "cut against the argument that the City condoned the use of excessive force." *Id.* at 852.  Here, by contrast, the three alleged incidents occurred in the confined space of a county jail—rather than the expansive jurisdiction of a large police department—and transpired over a significantly shorter period of sixteen months.  Perhaps more notably, the County, far from conducting an internal investigation into each suicide, allegedly ignored repeated commands from the Texas Commission on Jail Standards to institute adequate suicide screening.  Given this context—i.e., three similar incidents over sixteen months, the first two of which apparently went unaddressed despite warnings from the Commission—the Court concludes that Louzi has adequately pled that the County maintained a custom of failing to facilitate communication between its jail and medical staff about inmates who posed a suicide risk. *See Bramlett v. Buell*, 2004 WL 1243684, at *3 (E.D. La. June 3, 2004) ("It would be wholly unreasonable to require a plaintiff at this stage of the litigation to allege with specificity all of the other acts by other officers that he will rely upon to demonstrate a policy. No plaintiff can do that before discovery.").

### b.  Constitutional Violation and Causation

Finally, Louzi must satisfy the third prong of the municipal liability inquiry.  This prong

functionally requires two distinct showings:  First, that the alleged custom resulted in a constitutional violation, and second, that the custom was the moving force behind that violation. Defendants contend that Louzi can show neither.

Defendants most forcefully argue that Louzi fails to plead a constitutional violation, citing *Taylor v. Barkes*, 135 S. Ct. 2042 (2015), for the proposition that "[f]ederal constitutional law does not entitle Akueir to 'adequate suicide prevention protocols.'" (Doc. No. 32, ¶ 27 (quoting *Taylor*, 135 S. Ct. at 2044)).  Yet that case merely held that no such right was "clearly established" for qualified immunity purposes under Supreme Court or Third Circuit case law.  *Id.*  The Fifth Circuit, by contrast, has "been willing to entertain suicide-based claims as implicated the State's responsibility to provide medical care."  *Hare*, 74 F.3d at 644.  For instance, in *Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the Fifth Circuit stated that the "failure to provide pre-trial detainees with adequate protection from their known suicidal impulses is actionable under § 1983 as a violation of the detainee's constitutional rights."  *Id.* at 391.  That is precisely the violation that Louzi alleges here, so the Complaint adequately pleads a constitutional violation.

Defendants next argue that "the non-communication . . . custom cannot be alleged to have *caused* Akueir's suicide."  (Doc. No. 33 at 13.)  This argument, however, is conclusory; Defendants do not explain why it is "implausible" that "had there been communication, Akueir would have received treatment."  (Doc. No. 33 at 12–13.)  Indeed, the only explanation for why such a scenario would be implausible is that the County generally fails to provide treatment to inmates with known psychiatric problems, which the Court doubts Defendants wish to imply.  In any case, the Complaint adequately alleges causation:  It explains that "CCS and its employees . . . never provided any care or follow up treatment once Akueir was removed [from] suicide watch and . . . moved to solitary confinement," that jail staff "failed to make sufficient rounds to check

10

on Akueir" when he was in solitary confinement, and that it was the "abrupt and drastic change" of being placed in solitary confinement that "caused Mr. Akueir to become despondent" and commit suicide. (Doc. No. 32, ¶ 34.) Taking those facts in the light most favorable to Louzi and drawing all reasonable inferences in her favor, as the Court must, the Complaint thus suggests that adequate communication between CCS staff and jail staff would have resulted in either a decision not to place Akueir in solitary confinement or to monitor him more closely once he was so placed. Either scenario would have likely prevented Akueir's untimely death, and the alleged custom therefore constituted a "moving force" behind his suicide.

In sum, then, Louzi has adequately pled an alleged custom of non-communication between jail and medical staff regarding suicidal inmates. The Complaint can be read to allege that this custom was promulgated by Sheriff Nehls on behalf of the County; that sufficient similar incidents occurred to constitute a custom in the context of the timeframe and the Commission's ignored entreaties for the County to improve its suicide prevention policy; that this custom caused Akueir's suicide; and that the jail's failure to prevent the suicide was a constitutional violation. For those reasons, the Motion to Dismiss will be denied as to the non-communication custom.

### 2. Other Customs

The remaining custom-based claims, however, will be dismissed. Two of the other customs the Complaint alleges, *see supra* p. 7, relate to solitary confinement. (Doc. No. 32, ¶¶ 26, 33, 35.) But the Complaint does not allege a single prior instance of suicide at the jail stemming from solitary confinement—neither Correas nor Ethridge is alleged to have been placed in solitary confinement—and, as explained above, a pattern of similar incidents is necessary to adequately plead a custom. Both solitary-confinement-related custom-based claims must therefore be dismissed. Additionally, Louzi alleges that the jail maintained a custom of "not doing rounds."

11

(Doc. No. 32, ¶ 33.)  Yet the Complaint does not allege that Deputy Lewis missed a round prior to Akueir's suicide or otherwise explain how the County's policies regarding rounds caused Akueir's suicide.  That claim must therefore be dismissed as well.  Finally, Louzi alleges that the jail maintained a custom of "subjecting Mr. Akueir to inadequate care and supervision."  (*Id.*)  But to adequately plead a custom, "a plaintiff must demonstrate a pattern of abuses that transcends the error made in a single case."  *Peterson*, 588 F.3d at 850–51.  Because an alleged custom concentrated specifically on Akueir cannot meet this standard, that claim must also be dismissed.

### 3.  State-Law Claims

Louzi also vaguely alleges violations of the Texas Wrongful Death Act (TWDA), Texas Tort Claims Act (TTCA), and the doctrine of premises liability, apparently against the County.[4] (*See* Doc. No. 32 ¶ 45.)  Counties are expressly exempted from liability under the TWDA, so the TWDA claim must be dismissed.  Tex. Civ. Prac. & Rem. Code § 71.001.  Claims under the TTCA require showing either "(1) the direct use of property by a state actor, or (2) a defective condition of state-issued property."  *Forgan v. Howard County*, 494 F.3d 518, 521 (5th Cir. 2007).  Because Akueir used the state-provided bedding to hang himself and the bedding is not alleged to have been "defective," the TTCA claim must be dismissed as well.  Finally, premises liability claims require a showing of "a defect, shortcoming, or imperfection of the jail cell."  *Nunez v. City of Sansom Park*, 197 S.W.3d 837, 842 (Tex. Civ. App. 2006).  Although Louzi alleges that "the cell

---

[4] Louzi purports to bring these state-law claims against all Defendants.  (Doc. No. 32, ¶ 45.) But she does not explain how individuals could be liable under the TTCA, which deals with sovereign immunity, or under a theory of premises liability for the premises of their employer. Nor does she explain how any of the individual defendants are liable under the TWDA, which requires showing that a defendant perpetrated an injury for which "the individual injured would have been entitled to bring an action . . . if the individual had lived."  Tex. Civ. Prac. & Rem. Code § 71.003(a).  Indeed, the Complaint fails to allege any tort committed by any individual defendant or by CCS for which Akueir would have been able to recover had he lived.  Therefore, these claims are also dismissed as to the individual defendants and CCS.

layout, . . . video cameras[,] and sight lines" were defective, (Doc. No. 32, ¶ 46),  she does not explain how they were defective or how any such defects proximately caused Akueir's death. Therefore, the premises liability claim must also be dismissed.

### C.  CCS and the Individual Medical Defendants

Louzi also makes claims under section 1983 and Texas law against CCS and the individual medical defendants.  These defendants separately move to dismiss Louzi's claims against them. (Doc. No. 34 at 1.)  Their motion will be denied as to both the section 1983 and state-law claims.

### 1.  Section 1983

Louzi alleges that the individual medical defendants are liable under section 1983 for exercising deliberate indifference toward his serious medical needs.[5]  (Doc. 32, ¶¶ 37–42.)  The individual medical defendants contend that Louzi, "at most, alleges ordinary negligence."  (Doc. No. 34 at 4.)  This question is a close one, but the Court will hold that the Complaint adequately pleads deliberate indifference.

A claim of deliberate indifference toward serious medical needs has two elements.  First, Louzi must demonstrate deliberate indifference, which in this context requires showing that the individual medical defendants were "aware of a substantial risk of serious harm."  *Gobert v. Caldwell*, 463 F.3d 339, 348 (5th Cir. 2006).  Second, Louzi must demonstrate that the individual medical defendants "disregarded the substantial health risk about which [they] knew," which requires showing that the defendants "purposefully neglected [Louzi's] medical needs."  *Id.* at 349.

There is little doubt that the Complaint adequately alleges the first element, i.e., that the individual medical defendants were aware of a substantial risk of serious harm to Akueir.  The

---

[5] Although the Complaint does not say so expressly, CCS's alleged section 1983 liability is presumably predicated on the same theory of respondeat superior liability that Louzi pleads for her state-law claims.  (*See* Doc. No. 32 ¶ 47.)

Complaint alleges that each of the individual medical defendants "knew [Akueir] was at risk for suicide," "knew [Akueir] had adjustment [dis]order," "knew of [Akueir]'s past self-injurious behaviors," "knew [Akueir] had a history of suicide attempts," and "knew [Akueir] was in need of follow up treatment."  (Doc. No. 32 ¶¶ 37–41.)  These allegations are substantiated by the medical timeline allegedly provided by the County itself, which shows that Akueir told both Ferguson and Hashmi that he had a history of depression, suicide attempts, and mental illness.  (Doc. No. 32 at 10.)  The Complaint thus fully substantiates that the individual medical defendants were aware that Akueir was at a substantial risk of serious harm.

The second element—whether the individual medical defendants "disregarded the risk" to Akueir—is closer.  The individual medical defendants contend, without explanation, that the Complaint "sets forth no facts that, if proved," would support a finding that they disregarded the risk to Akueir.  (Doc. No. 34 at 4.)  The Court largely disagrees.  The Complaint alleges that Lisiecki removed Akueir from medical observation after he reported no feelings of depression and that Zipprian designated Akueir with the highest-functioning mental health status available, despite his troubling reports to Ferguson.  (Doc. No. 32 at 10.)  It further alleges that Hashmi determined, despite Akueir's report of "a past psychiatric history of self[-]injurious behaviors," that he did "not appear to need psychiatric treatment at this time."  (Doc. No. 32 at 10–11.)  Seen in the light most favorable to Louzi, these facts suffice to demonstrate that the individual medical defendants, with the exception of Ferguson, disregarded a risk to Akueir.  On the other hand, Ferguson is alleged only to have recorded Akueir's psychiatric history, referred him to a psychiatrist, and conducted a follow-up appointment with him—not actions that could be taken as manifesting a disregard to Akueir's well-being, even taken in the light most favorable to Akueir.  Therefore, Lisiecki, Zipprian, and Hashmi's Motion to Dismiss the section 1983 claims must be

14

denied, while Ferguson's Motion to Dismiss the section 1983 claims must be granted.

### 2. Medical Malpractice

Louzi also brings a claim for medical malpractice against the individual medical defendants and, under a theory of respondeat superior, CCS. (Doc. No. 32 ¶¶ 45–47.) Except as to Ferguson, the Motion to Dismiss will be denied as to these claims.

To state a claim of medical malpractice, Louzi must show that: (1) the individual medical defendants had a duty to comply with a specific standard of care; (2) the defendants breached that standard of care; (3) Akueir was injured; and (4) the breach of the standard of care caused the injury. *Price v. Divita*, 224 S.W.3d 331, 336 (Tex. Civ. App. 2006). The individual medical defendants contend that "the Complaint does not identify what standard of care" is applicable or how each individual medical defendant "failed to comply with the standard of care." (Doc. No. 34 at 5.) Their argument is mistaken.

Louzi adequately alleges each of the four elements of a medical malpractice claim. In Texas, jail medical staff owes a standard of care to suicidal inmates. *Kassen v. Hatley*, 887 S.W.2d 4, 12 (Tex. 1994). That standard of care is breached when the medical defendant negligently fails to take appropriation action where an inmate's suicide was foreseeable. *Id.* at 13. Here, then, Louzi has properly pled all four elements of her claim: (1) the individual medical defendants owed Akueir a duty to comply with a specific standard of care under *Kassen*; (2) they allegedly breached that duty by allowing him to be discharged from medical monitoring despite a history of serious mental illness and suicide attempts; (3) Akueir killed himself; and (4) he would not have done so had he remained under medical monitoring. (*See* ¶¶ 37–42.) The Motion to Dismiss the medical malpractice claim must therefore be denied, except as to Ferguson for the reasons stated above.

## IV.    Conclusion

In sum, the Court holds that Defendants' Motions to Dismiss (Doc. Nos. 33 and 34) are GRANTED IN PART and DENIED IN PART.  Louzi has plausibly alleged the following claims: A section 1983 claim predicated on a custom of non-communication between jail and CCS staff, in violation of Akueir's constitutional right to adequate protection from known suicidal impulses, against the County; a section 1983 claim of deliberate indifference to Akueir's serious medical needs against CCS and Defendants Lisiecki, Zipprian, and Hashmi; and a medical malpractice claim against CCS and Defendants Lisiecki, Zipprian, and Hashmi.  On the other hand, Defendants Lewis, Crochet, and Ferguson are dismissed.   All custom-based claims, except for the claim predicated on a custom of noncommunication between jail and CCS staff, are dismissed.  The TWDA, TTCA, and premises liability claims are dismissed.  All dismissals are without prejudice, except as to Defendants Lewis and Crochet, who are dismissed with prejudice.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 26th day of August, 2020.

_____

HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE